In the Matter of the EXTRADITION
OF Curtis Andrew HOWARD.

Civ. A. No. 91–13056–H.

United States District Court,
D. Massachusetts.

May 14, 1992.

**32**

Jeffery Allan Denner, Denner & Associates, Newton, Mass., for appellant.

Victor A. Wild, U.S. Attys. Office, Boston, Mass., for appellee.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

*Procedural Background*

On June 5, 1991, the United States Attorney for the District of Massachusetts filed a Complaint for and on behalf of the United Kingdom seeking the provisional arrest and extradition of Curtis Andrew Howard ("appellant"). The following day, June 6, 1991, following his arrest in Boston, the appellant was charged with Murder, Contrary to Common Law, as stated in the arrest warrant duly issued by Justice of the Peace Bryan Harry Hanson at Crawley Magistrate's Court, Sussex, England on June 1, 1991. Extradition in this matter was sought pursuant to the Treaty of Extradition and Exchange of Notes signed at London on June 8, 1972, and entered into force on January 21, 1977 (28 UST 227; TIAS 8468; 1049 UNTS 167) ("Extradition Treaty") and Supplementary Extradition Treaty with the United Kingdom signed June 25, 1985, and entered into force on December 23, 1986 (24 ILM 1105–1109) ("Supplementary Treaty"). *See*, Executive Report 99–17, 99th Congress, Second Session, June 26, 1986.

Pursuant to 18 U.S.C. § 3184, an extradition hearing was conducted before Magistrate Judge Cohen on September 10, 1991. At that hearing the appellant did not contest that the evidence submitted to the court (totaling 518 pages of documents) established probable cause to believe that he had committed the crime charged in the Complaint. Rather the appellant asserted that he had a valid defense to extradition pursuant to Article 3(a) of the Supplementary Treaty. Article 3(a) states, in pertinent part:

(a) Notwithstanding any other provision of this Supplementary Treaty, extradition shall not occur if the person sought establishes by a preponderance of the evidence that ... he would, if surrendered, be prejudiced at his trial or be punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions.

Specifically, the appellant asserted that pre-trial publicity surrounding this case in England was both racially and nationally biased (appellant is a black United States citizen) and that as a result it would be impossible for him to receive a fair trial in an English court.

On November 18, 1991 Magistrate Judge Cohen entered a Certification of Extraditability and Order of Commitment accompanied by a forty-three page Memorandum and Order on Extradition in which Magistrate Judge Cohen fully elaborated his findings, setting forth in great detail the factual bases therefor. Specifically, Magistrate Judge Cohen made the following findings:

A. That there is an extradition treaty in force between the United States and the United Kingdom;

B. That there is a criminal charge pending against the said Curtis Andrew Howard in the United Kingdom, for which a warrant of arrest has issued;

C. That the crime with which the said Curtis Andrew Howard has been charged in the United Kingdom is an extraditable crime within the meaning of the treaty then and there in force;

D. That the said Curtis Andrew Howard currently before this Court is the same Curtis Andrew Howard who is charged in the United Kingdom;

E. That the evidence submitted establishes probable cause to believe that the said Curtis Andrew Howard committed the charged offense; and

F. That the said Curtis Andrew Howard has not established by a preponderance of the evidence, a valid defense to extradition, under Article 3(a) of the Supplemental Treaty or otherwise.

The appellant filed a Notice of Appeal, pursuant to Article 3(b) of the Supplemental Treaty, with this Court on November 20, 1991.

*Discussion*

1. *The Applicability of Article 3(b)*

█ Article 3(b) of the Supplementary Treaty provides, in pertinent part:

In the United States, the competent judicial authority shall only consider the defense to extradition set forth in paragraph (a) for offenses listed in Article 1 of this Supplementary Treaty. A finding under paragraph (a) shall be immediately appealable by either party to the United States district court, or court of appeals, as appropriate.

The first issue to be determined is whether Article 3(b) gives the appellant the right to appeal the Magistrate's finding under Article 3(a). In both its brief and in oral argument before this Court, the Government asserted that Article 3(b) was intended to give the right to appeal a finding under Article 3(a) only to the Government not to the fugitive. His proper avenue of appeal,

the Government stated, was by way of a petition for a writ of *habeas corpus*. Thus, the Government maintained, the appellant was not properly before this Court.

The Government is correct in noting that Article 3(b) gave the Government a right of appeal that it did not previously have under then-current extradition law. The Government overreaches, however, when it asserts that, because a fugitive already had a right to appeal an extradition finding by way of a petition for *habeas corpus*, the appeal right created in Article 3(b) was intended to run *only* to the Government. This contradicts the clear language of Article 3(b) which specifically states that "[a] finding under paragraph (a) shall be immediately appealable by *either party* ..." (emphasis added).

█ Indeed, the appellant would *not* be able to appeal a finding under Article 3(a) via a petition for *habeas corpus* review. In the context of a challenge to extradition, a *habeas corpus* review is available "only to inquire [1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty and, by a somewhat liberal extension, [3] whether there was reasonable ground to believe the accused guilty." *Romeo v. Roache*, 820 F.2d 540, 543–544 (1st Cir.1987), *quoting Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925). Nothing within this limited scope of review would permit a reviewing court to consider the issues raised by a fugitive invoking a defense under Article 3(a).

It assumes too much to suggest that the Senate not only did not intend that Article 3(b) carry its plain meaning, but also that it intended to change the existing body of law, regarding *habeas corpus* review of extradition proceedings, without stating so, either expressly or impliedly, within the body of the Supplementary Treaty or the accompanying Executive Report. Clearly, just as the Senate intended Article 3(a) to permit new avenues of inquiry which previously could not be considered by a court in an extradition hearing, so too did it intend Article 3(b) to create a new right of appeal, outside of the context of a traditional *habe-*

as corpus proceeding. See S.Exec.Rep. No. 99–17, 99th Cong., 2d Sess. 3–7. Thus, this Court concludes that the appellant does, in fact, have a right to appeal pursuant to Article 3(b) of the Supplementary Treaty.

### 2. The Appropriate Standard of Review Under Article 3(b)

██ The next question raised by the parties is what standard of appellate review is applicable to appeals under Article 3(b).[1] On its face Article 3(b) is silent as to what standard of review should be applied. The appellant asserts that the Supplementary Treaty calls for a de novo standard of review. The Government represents that any appellate review under Article 3(b) should be conducted under the "clearly erroneous" standard.

Appellant asserts that, because Article 3 has expanded the traditional scope of inquiry in an extradition hearing, it has also created an inherent de novo standard of review. Yet, after thoroughly reviewing the legislative history of the Supplementary Treaty, this Court has found absolutely no indication the Senate intended a de novo standard of review to apply to appeals brought pursuant to Article 3(b). Since the application of a de novo standard of review would be a radical departure from existing extradition law, such complete silence on this issue is a telling indication that it was not the Senate's intent to establish such a standard.

The language of Article 3 itself, along with the accompanying Senate Executive Report, clearly weigh against the application of a de novo standard of review. Under the terms of the Supplementary Treaty, an initial finding under Article 3(a) may be made either by a Federal Magistrate or a Federal District Court Judge, with an appeal being taken to the next highest court "as appropriate." See S.Exec.Rep. No. 99–17, 99th Cong., 2d Sess. at 8. Thus, if the initial finding on a defense raised under Article 3(a) were made by a Federal District Court, the appeal under Article 3(b) would be taken to the Circuit Court of Appeals. The unreasonableness of suggesting that the Senate intended that a Circuit Court of Appeals conduct a de novo review without either expressly or impliedly stating so anywhere within the body of the Supplementary Treaty, or even within the Committee Report, is readily apparent. This Court therefore concludes that a de novo standard does not apply to appeals brought pursuant to Article 3(b) of the Supplemental Treaty.

Under Article 3(a) a fugitive must establish by a preponderance of the evidence that he would be prejudiced at trial on account of his race or nationality. As this is a factual question, appellate review is to be made under the "clearly erroneous" standard. See Caplan v. Vokes, 649 F.2d 1336, 1342 (9th Cir.1981) (Purely factual questions in extradition cases are to be reviewed under the "clearly erroneous" standard); see also United States v. McConney, 728 F.2d 1195, 1203 (9th Cir. 1984) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) (Where applicable legal standard provides for a strictly factual test, the inquiry is "essentially factual" and the "clearly erroneous" standard of review is appropriate).

██ This Court has thoroughly reviewed the entire record before it. Magistrate Judge Cohen's detailed findings, as set forth in his Memorandum and Order of November 18, 1991, are amply supported by the record and are not clearly erroneous. In particular, this Court notes the Magistrate's finding that while some of the pretrial publicity may be characterized as racially biased[2] (e.g., one article described the appellant as a "hulking giant from a slum" and was accompanied by the appellant's booking photo), such publicity lasted

---

1. There is no dispute to the fact that the crime with which the appellant has been charged—Murder, Contrary to Common Law—is an offense listed in Article 1 of the Supplementary Treaty.

2. It should also be noted that several of the articles. including the one quoted above, also made positive references to the appellant's brilliant skills as a computer student and listed the various honors he had received.

only three days, from June 1, 1991 through June 4, 1991.[3] At this time, nearly a year has elapsed since this crime, and the appellant's alleged involvement in it, was first reported. It will doubtless be at least several months before the appellant would stand trial in Britain.

To the extent that there may be any lingering taint due to racially or nationally biased pretrial publicity, the record indicates that the British judicial system has in place ample pretrial procedures to ensure that the appellant receives a fair trial. Given these factors, including the overwhelming weight of the evidence against the appellant, this Court agrees with the Magistrate's finding that the appellant has fallen far short of meeting his burden of demonstrating by a preponderance of the evidence that he *would* be prejudiced at trial on account of his race or nationality.

Therefore, this Court concludes that the Magistrate's findings are not clearly erroneous and the Certification of Extraditability and Order of Commitment are hereby AFFIRMED.

---

3. Because of workings of Britain's Contempt of Court Act the appellant need not be concerned about such publicity occurring again.