In re EXTRADITION OF Curtis Andrew HOWARD.

UNITED STATES of America, Petitioner, Appellee,

v.

Curtis Andrew HOWARD, Respondent, Appellant.

No. 92–1633.

United States Court of Appeals, First Circuit.

Heard May 3, 1993.

Decided June 30, 1993.

Jeffrey A. Denner, with whom George Garfinkle and Perkins, Smith & Cohen were on brief, for appellant.

Victor A. Wild, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., was on brief, for appellee.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

This appeal presents several issues of first impression in extradition law generally and, more specifically, regarding a rather distinctive extradition treaty in force between the United States and the United Kingdom of Great Britain and Northern Ireland (U.K.). We must determine, *inter alia*, (1) whether, under the treaty, the second of two successive appeals from a certification of extraditability is within our jurisdiction; (2) if so, what standard of review governs such appeals; (3) whether the treaty alters the venerable rule of noninquiry; and (4) if so, to what extent. After grappling with these, and other, matters, we eventually address the merits of the appeal and conclude that the determination of extraditability must stand.

## I. BACKGROUND

The seeds of this appeal were sown on June 1, 1991, when a policeman discovered the mutilated body of Catherine Elizabeth Ayling, a young white female, in the trunk of a rental car abandoned at England's Gatwick Airport. Suspicion immediately centered on respondent-appellant Curtis Andrew Howard, a United States citizen. Charges were preferred. Because Howard had returned to his native land, British authorities sought to extradite him. On June 5, 1991, the United States Attorney for the District of Massachu-

setts requested and received from a federal magistrate judge a warrant for Howard's provisional arrest. *See* 18 U.S.C. § 3184 (1988 & Supp. II 1990); D.Mass.Loc.Mag.R. 1(e). Howard was apprehended. He appeared for an extradition hearing before the magistrate judge on September 10, 1991.

At the hearing Howard did not dispute the existence of probable cause to believe he had murdered Ayling. Rather, Howard, who is black, argued that he would be prejudiced during legal proceedings in the U.K. by reason of his race and nationality, a circumstance which, if true, constituted a defense to extradition under the relevant treaty. *See* Supplementary Extradition Treaty, June 25, 1985, U.S.–U.K., art. 3(a), *reprinted in* S.Exec.Rep. No. 17, 99th Cong., 2d Sess. 15–17 (1986) (Supplementary Treaty). In support of this defense, Howard proffered evidence of flamboyant publicity surrounding his case, sought to show that Britons would likely be prejudiced against blacks—particularly those accused of murdering young white females—and pointed out that England's legal system does not make any provision for voir dire of prospective jurors. These proffers did not sufficiently impress the magistrate: he ruled that Howard had not established a valid defense to extradition and thereupon issued a certification of extraditability, together with an order of commitment.[1] *See* 18 U.S.C. § 3184.

Howard appealed. The district court exercised jurisdiction, reviewed the magistrate's findings for clear error, and affirmed. *See In re Howard*, 791 F.Supp. 31 (D.Mass.1992). Howard appeals anew.

## II. THE SUPPLEMENTARY TREATY

Because the Supplementary Treaty departs from accepted extradition protocol, we trace its origins and spotlight its key provisions.

In 1972, the United States and the U.K. negotiated new terms governing reciprocal extradition from one nation's territory of persons accused or convicted of certain offenses committed in the other nation. *See* Extradition Treaty, June 8, 1972, U.S.–U.K., art. I, 28 U.S.T. 227, 229 (Treaty). Under the Treaty, murder was an extraditable offense. *See id.* art. III(1). Nonetheless, the Treaty allowed a signatory to refuse extradition if it regarded the offense "as one of a political character." *Id.* art. V(c)(i). This exception sired friction between the two traditional allies when federal judges in the United States began interpreting it to bar extradition of members of the Provisional Irish Republican Army. *See* S.Exec.Rep. No. 17, *supra*, at 2; *see also* 132 Cong.Rec. 16,558–86 (1986) (collecting cases).

To ameliorate this situation, the signatories negotiated treaty amendments aimed at eradicating the political offense exception for acts of violence. *See* S.Treaty Doc. No. 8, 99th Cong., 1st Sess. (1985) (Proposed Supplementary Treaty); *see also* S.Exec.Rep. No. 17, *supra*, at 2. However, when President Reagan submitted the Proposed Supplementary Treaty to the Senate, seeking its advice and consent, the document received mixed reviews. *See United States and United Kingdom Supplementary Extradition Treaty: Hearings Before the Senate Comm. on Foreign Relations*, 99th Cong., 1st Sess. (1985). Following many months of strident debate, the opposing camps reached a compromise, placing most violent crimes beyond the political offense exception's reach but adding certain novel safeguards for the protection of potential extraditees. *See* S.Exec. Rep. No. 17, *supra*, at 4–5. On July 17, 1986, the Senate ratified the proposed treaty subject to the addition of these, and other, amendments. *See* 132 Cong.Rec. 16,819 (1986). Following approval of the modified version by the House of Commons, instruments of ratification were exchanged on December 23, 1986. *See* Supplementary Treaty, *supra*, *reprinted at* Hein's No. KAV 2053; *see also* I.I. Kavass et al., *Extradition: Laws*

---

1. The magistrate found that all the basic prerequisites to extradition had been fulfilled in that the United States and the U.K. are parties to an extradition treaty; a criminal charge is pending against Howard in the U.K.; the charged offense is an extraditable crime under the treaty; the person charged is the same person whom the government wants extradited; an arrest warrant is outstanding; and probable cause exists to believe that Howard committed the crime. None of these findings are contested on appeal.

*and Treaties* 920.20d–h (1979 & Supp.1989). At that point, the Supplementary Treaty went into force.

An aspect of the Senate-forged compromise lies at the core of the instant case. As ratified, the Supplementary Treaty prohibits extradition "if the person sought establishes ... by a preponderance of evidence that ... he would, if surrendered, be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality, or political opinions." Supplementary Treaty, art. 3(a). Appellant's case rests squarely upon this proviso.

## III. APPELLATE JURISDICTION

 The Supplementary Treaty stipulates that the trier's findings with regard to an article 3(a) defense are "immediately appealable by either party to the United States district court, or court of appeals, as appropriate." *Id.* art. 3(b). The initial question that commands our attention concerns the extent of our jurisdiction under this provision. We raised this issue at oral argument, as a court must when it harbors doubts about the existence of its subject matter jurisdiction, *see In re Recticel Foam Corp.,* 859 F.2d 1000, 1002 (1st Cir.1988) (emphasizing that "a court has an obligation to inquire sua sponte into its subject matter jurisdiction"), and directed the parties to furnish supplemental briefs.[2]

### A. *Past Practice.*

 Ordinarily neither party to an extradition proceeding may challenge a decision rendered therein by direct appeal. This disability developed because the relevant statute, 18 U.S.C. § 3184, does not contemplate hearings by United States courts *qua* United States courts, *see In re Mackin,* 668 F.2d 122, 125–30 (2d Cir.1981) (collecting authorities and tracing history of extradition proceedings), but, instead, directs that extradition matters be heard by "any justice or judge of the United States," any authorized magistrate, or certain state judges. Therefore, an officer who presides over such a

proceeding is not exercising "any part of the judicial power of the United States." *In re Kaine,* 55 U.S. (14 How.) 103, 120, 14 L.Ed. 345 (1852). Rather, the officer acts in a non-institutional capacity by virtue of a "special authority." *In re Metzger,* 46 U.S. (5 How.) 176, 191, 12·L.Ed. 104 (1847); *see also Shapiro v. Ferrandina,* 478 F.2d 894, 901 n. 3 (2d Cir.) (applying same principle to current statutory provision), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *Mackin,* 668 F.2d at 125–30 (same); *Jimenez v. Aristeguieta,* 290 F.2d 106, 107 (5th Cir. 1961) (same). The officer's only tasks are to determine whether an individual is extraditable, and if so, to certify extraditability to the ultimate decisionmaker (the Secretary of State). *See* 18 U.S.C. §§ 3184, 3186 (1988 & Supp. II 1990).

 In, light of this curious arrangement, numerous courts have held that 28 U.S.C. § 1291, which permits appeals of "final decisions of the district *courts*" (emphasis supplied), does not contemplate appeals from decisions of judicial officers sitting in extradition matters. *See, e.g., Ahmad v. Wigen,* 910 F.2d 1063, 1065 (2d Cir.1990); *Quinn v. Robinson,* 783 F.2d 776, 786 n. 3 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). Given the absence of any other statutory hook on which jurisdiction over such appeals can be hung, a putative extraditee customarily can challenge an order for extradition only by collateral attack, typically through habeas corpus. *See Collins v. Miller,* 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920); *Koskotas v. Roche,* 931 F.2d 169, 171 (1st Cir.1991). By the same token, the government, if it fails in an extradition attempt, cannot appeal, but must file anew. *See Mackin,* 668 F.2d at 128; *Hooker v. Klein,* 573 F.2d 1360, 1364–68 (9th Cir.), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978); *see also Collins v. Loisel,* 262 U.S. 426, 430, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923).

### B. *Article 3(b).*

Appellant argues that the Supplementary Treaty revolutionizes this praxis insofar as

---

2. It is, of course, settled that parties cannot confer subject matter jurisdiction on a federal court by acquiescence or agreement. *See Insurance*

*Corp. of Ir. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982).

the extradition target asserts defenses cognizable under article 3(a). The government argues the inverse, imploring that neither the President nor the Senate intended to work so abrupt a tergiversation. We agree with appellant that the Supplementary Treaty, which has the force of law, U.S. Const. art. VI, cl. 2, effects a sea change in established policy.

■ The Supplementary Treaty provides that a finding anent a so-called article 3(a) defense, involving race, religion, nationality, or political opinion, "shall be immediately appealable by either party to the United States district court, or court of appeals, as appropriate." Supplementary Treaty, art. 3(b). This appeal provision, which apparently finds its genesis in an earlier (failed) attempt to alter the protocol prohibiting direct appeals in extradition matters, see 132 Cong. Rec. 16,599 (1986), is couched in plain language and, in our view, means precisely what it says. See *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982) (explaining that a treaty's literal language must be given effect unless patently contrary to the signatories' intentions and expectations). In crafting the appeal provision, the drafters carefully drew a distinction between hearings held under 18 U.S.C. § 3184 and appeals taken to courts cloaked with the judicial power of the United States. In discussing the former, the document refers to "the competent judicial authority" who is "[i]n the United States." Supplementary Treaty, art. 3(b); *see also id.* arts. 2, 3(a). By contrast, in discussing appeals, the treaty refers to United States courts by name. *See id.* art. 3(b). The same distinction recurs in the legislative history. *See, e.g.*, S.Exec.Rep. No. 17, *supra*, at 8. That is a significant datum, for, if the language of a treaty is at all ambiguous, courts may look to legislative history in interpreting its provisions under virtually the same rules that obtain when courts interpret statutes. *See Factor v. Laubenheimer*, 290 U.S. 276, 294–95, 54 S.Ct. 191, 196, 78 L.Ed. 315 (1933).

■ The other straws in the interpretive wind bend in the same direction. The Supplementary Treaty stipulates that the "Federal Rules of Appellate Procedure or Civil Procedure, as appropriate, shall govern the appeals process." Supplementary Treaty, art. 3(b). And, again, the legislative history reinforces the point, indicating that the disputed provision "is not intended to make the Federal rules generally applicable to the extradition hearing itself, but only to the appeal of a decision under article 3(a)." S.Exec. Rep. No. 17, *supra*, at 8. In short, the text of article 3(b), taken as a whole, suggests not only that an appeal thereunder represents an entry into the federal courts but also that extradition proceedings involving article 3 differ in kind from those involving only 18 U.S.C. § 3184.

We rule, therefore, that the Supplementary Treaty marks a clean break from the ancient prohibition on direct appeals in extradition matters; where article 3 is implicated, the Supplementary Treaty contemplates at least one appeal as of right. *Accord In re McMullen*, 989 F.2d 603, 609 (2d Cir.1993) (en banc). Moreover, because the Supplementary Treaty explicitly identifies United States *courts*, not judges or justices, as the appellate authority, *see* Supplementary Treaty, art. 3(b), it unlocks the gate which has historically barred extradition matters from proceeding further through the federal courts in the same manner as other cases.

### C. *Successive Appeals.*

■ Our jurisdictional odyssey is not yet ended. Noting that article 3(b) provides for appeals to the district court *or* court of appeals, the government asserted below that this disjunctive language restricts the parties to one bite of the apple and rules out successive appeals (such as Howard essays). In this court, however, the government backtracks, appearing to concede that, notwithstanding Howard's earlier appeal, we have jurisdiction over this appeal. But, since this point implicates appellate jurisdiction and is non-frivolous, *see post* (Campbell, J., concurring), we are not at liberty simply to accept the government's concession. *See supra* note 2. We proceed to ponder the point.

■ We think the language of article 3(b) dictates a construction antithetic to that

which the government urged below. Because the Supplementary Treaty contemplates the initiation of extradition proceedings before either a district judge or a magistrate judge, *see* S.Exec.Rep. No. 17, *supra,* at 5, 6, 8, article 3(b) prudently provides for review by the "district court, or court of appeals, as appropriate." In other words, the disjunctive "or" is to be read not as an unusual, but understated, restriction on the *number* of appeals; rather, the term specifies that the ordinary *sequence* of appeals should apply. This conclusion is supported by the reference in article 3(b) to the "appeals process," as well as by the legislative history. *See* S.Exec. Rep. No. 17, *supra,* at 8.

We will not cart coal to Newcastle. Not even so much as a solitary word or phrase in the Supplementary Treaty intimates an intent to prohibit successive appeals—and it is not the courts' business to rewrite a treaty's text.[3] Accordingly, we hold that article 3(b) permits successive appeals, *see, e.g., United States v. Van Fossan,* 899 F.2d 636, 637–38 (7th Cir.1990) (holding that, in the absence of an express provision prohibiting successive appeals, the criminal misdemeanor statute, 18 U.S.C. § 3402 (1988), permits them); *United States v. Forcellati,* 610 F.2d 25, 28 (1st Cir.1979) (similar), *cert. denied,* 445 U.S. 944, 100 S.Ct. 1342, 63 L.Ed.2d 778 (1980), to be given expedited consideration, however, as article 3(b) itself provides, "at every stage."

### D. *Recapitulation.*

To sum up, the language and legislative history of the Supplementary Treaty make it clear that the appeal right provided by article 3(b) implicates a "decision[ ] of the district court" within the meaning of 28 U.S.C. § 1291. In this sense, then, article 3(b) breaks with traditional practice by authorizing direct appeals to the federal courts from certain determinations regarding extradition. What is more, the pertinent treaty provision permits successive appeals from a magistrate judge's decision to the district court and thereafter to the court of appeals. Because

that path was followed here, appellate jurisdiction attaches.

## IV. STANDARD OF REVIEW

■ Having cleared the jurisdictional hurdle, we turn next to appellant's asseveration that the district court employed a faulty standard of review. Because this presents a purely legal question, requiring an interpretation of the Supplementary Treaty, our review is plenary. *See, e.g., United States v. Washington,* 969 F.2d 752, 754 (9th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993); *Quinn,* 783 F.2d at 791.

### A. *Principles Governing Review.*

Determinations concerning article 3(a) defenses "shall be immediately appealable by either party" through the instrumentality of "filing a notice of appeal." Supplementary Treaty, art. 3(b). But, though this article grants rights of appeal, it does not mention standards of review. We look, therefore, to first principles.

■ Absent a specific statutory directive to the contrary, appeals in the federal court system are usually arrayed along a degree-of-deference continuum, stretching from plenary review at one pole to highly deferential modes of review (*e.g.,* clear error, abuse of discretion) at the opposite pole. At the "no deference" end of the continuum lie appeals involving unadulterated questions of law, the resolution of which customarily entails *de novo* review. *See, e.g., Liberty Mutual Ins. Co. v. Commercial Union Ins. Co.,* 978 F.2d 750, 757 (1st Cir.1992). At the other end of the continuum lie appeals involving straight factual determinations, the resolution of which customarily entails acceptance of the trier's judgment in the absence of palpable error. *See, e.g., Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 152 (1st Cir. 1990) (holding that appellate courts "ought not to upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, [the appellate judges] form a strong,

---

3. We appreciate the force of the policy considerations mentioned by Judge Campbell, *see post* (Campbell, J., concurring), but we believe that

such matters must be left to those charged with negotiating, executing, and ratifying treaties.

unyielding belief that a mistake has been made"); *see also* Fed.R.Civ.P. 52(a).

■ There are, however, difficulties in classification. Many cases involve what courts term "mixed" questions—questions which, if they are to be properly resolved, necessitate combining factfinding with an elucidation of the applicable law. The standard of review applicable to mixed questions usually depends upon where they fall along the degree-of-deference continuum: the more fact-dominated the question, the more likely it is that the trier's resolution of it will be accepted unless shown to be clearly erroneous. *See, e.g., United States v. Mariano,* 983 F.2d 1150, 1158–59 (1st Cir.1993); *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 990–91 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991).

■ Given that the Supplementary Treaty is silent on the subject, we presume that the framers, in providing for appeals to the federal courts, intended ordinary standards of review to apply. *See* S.Exec.Rep. No. 17, *supra,* at 8 ("Nothing in article 3(b) is to be interpreted as ·... upsetting established rules of appellate procedure."); *see also Gioiosa v. United States,* 684 F.2d 176, 179 (1st Cir.1982) (discussing standard of review in appeal from magistrate to district court). Because issues of the sort envisioned in article 3(a) are typically fact-specific, appellate review of findings anent such issues will, absent an error of law, most often proceed under the clear-error·rubric. *See, e.g., Pullman–Standard v. Swint,* 456 U.S. 273, 289–90, 102 S.Ct. 1781, 1790–91, 72 L.Ed.2d 66 (1982) (reviewing district court findings anent race discrimination for clear error); *Beasley v. Health Care Serv. Corp.,* 940 F.2d 1085, 1088 (7th Cir.1991) (similar in respect to discrimination based on religious beliefs); *Rendon v. AT & T Technologies, Inc.,* 883 F.2d 388, 392 (5th Cir.1989) (similar; discrimination based on national origin); *Gierbolini–Colon v. Aponte–Roque,* 848 F.2d 331, 333 (1st Cir.1988) (similar; political discrimination); *but cf. Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 514, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984) (holding that clearly erroneous standard does not apply to review of quasi-legal "finding" of actual malice in First Amendment context).

■ This conclusion is buttressed by analogy to traditional habeas corpus practice in the extradition field. When a party collaterally challenges a magistrate's determination of extraditability, judicial review is sharply circumscribed. · *See, e.g., Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *In re Manzi,* 888 F.2d 204, 205 (1st Cir.1989) (per curiam), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990). The most prominent exception is for a claim that the crime constitutes a non-extraditable political offense. Review of political offense determinations follows the continuum analysis described above. *See Quinn,* 783 F.2d at 790–91 & n. 9. Because defenses under article 3(a) are analogous to political offense determinations—indeed, the fundamental compromise undergirding the Supplementary Treaty treated the one as a replacement for the other—common sense suggests that the same standard of review should apply.

Last, but surely not least, appellant's contention that district court review under article 3(b) must always be *de novo* is at war with the words and purposes of the Supplementary Treaty. The treaty expresses a strong interest in expediting extradition matters. *See* Supplementary Treaty, art. 3(b) (providing for "immediate[ ]" appeals and requiring "expedited .consideration at every stage"). The legislative history is in the same vein. *See, e.g.,* 132 Cong.Rec. 16,607 (1986) (admonishing that the treaty's safeguards·should not afford "protracted sanctuary in the United States"). Wholesale *de novo* review not only would ignore the factfinder's superior vantage point for judging the intricacies of a contested case but also would be wasteful, engendering unwarranted delays in the extradition process.

In general, then, reviewing courts should apply·the clearly erroneous standard to the trier's findings of fact in situations where article 3 of the Supplementary Treaty is in play.

## B. *Applying the Principles.*

 In this case, the district court treated the magistrate's finding that no cognizable article 3(a) defense existed as factual in nature and applied the clearly erroneous test. As to appellant's principal claim—that, if extradited, he would suffer prejudice on account of his race or nationality—we endorse the district court's choice of a standard of review. The claim in question challenged the magistrate's underlying factual determination that, on the evidence adduced, appellant had not proved meaningful prejudice. This fact-intensive finding evokes clear-error review.[4]

 There is, however, a second facet of appellant's claim, as to which the district court chose the wrong standard of review. The magistrate held that article 3(a) does not necessarily bar extradition whenever a respondent shows the existence of some pre-formed ideas in the requesting nation but that the biases must rise to a level where they actually prejudice the respondent before article 3(a) affords relief.[5] The soundness of this analysis—which depends upon whether the terms employed in article 3(a) encompass all nationality-based and race-based biases or only those directly affecting a particular respondent—involves interpretation of the Supplementary Treaty. Treaty interpretation is a purely legal exercise as to which, under the criteria limned above, *see supra* Part IV(A), no deference is due to the trier. Accordingly, the district court should have scrutinized the magistrate's ruling on this issue *de novo.*

 That the district court failed to afford plenary review on this aspect of the case does not mean that we must remand. To do so would needlessly throw the helve after the hatchet. *See Gioiosa,* 684 F.2d at 179. Rather, because the question is quintessentially legal and this court is fully capable of deciding it without any further development of the record, we can simply address and resolve it. *See, e.g., Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 642 (1st Cir.1992); *Gioiosa,* 684 F.2d at 179.

## V. PREJUDICE UNDER THE SUPPLEMENTARY TREATY

With this preface, we proceed directly to the treaty-interpretation question, affording plenary review.

### A. *Traditional Practice.*

 A sovereign's right to obtain the extradition of an accused is created by treaty; where there is no treaty, a requested nation has no duty to extradite. *See Factor,* 290 U.S. at 287, 54 S.Ct. at 193. Indeed, federal courts have stated that no branch of government has authority to surrender an accused to a foreign country except in pursuance of a statute or treaty. *See Quinn,* 783 F.2d at 782 (collecting cases).

 An extradition treaty does more than bridge this gap. The existence of such a treaty between the United States and another nation indicates that, at least in a general sense, the executive and legislative branches consider the treaty partner's justice system sufficiently fair to justify sending accused persons there for trial. *See Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911); *Neely v. Henkel (No. 1),* 180 U.S. 109, 123, 21 S.Ct. 302, 307, 45 L.Ed. 448 (1901). In habeas corpus proceedings, this rationale has produced the rule of noninquiry—a doctrine which forbids judicial authorities from investigating the fairness of a requesting nation's justice system when considering whether to permit extradition to that nation. *See Glucksman,* 221

---

4. Since this is a successive appeal, we evaluate for ourselves whether clear error characterized the magistrate's factual finding that appellant failed to prove the existence of cognizable prejudice under article 3(a). *See infra* Part VI.

5. In a second branch of his analysis, the magistrate found that, in any event, the weight of the evidence against Howard was so great that no decisionmaker would be distracted from it by whatever slight biases might exist. We express no opinion on the appropriateness of this analytic approach as appellant "does not suggest that the [magistrate] was expected to ignore the weight of the probable cause evidence" in making his article 3(a) determination. Appellant's Brief at 25.

U.S. at 512, 31 S.Ct. at 705; *Manzi*, 888 F.2d at 206 (collecting cases).[6]

Of course, the signing of a treaty does not forever put to rest questions concerning the fairness of another country's legal framework. For example, an extradition target may present such issues to the Secretary of State—the official who ultimately decides whether a person found to be extraditable should in fact be extradited. *See* 18 U.S.C. § 3186. But, traditionally, in extradition cases, the judiciary neither asks, nor seeks to answer, questions about the sensitivities and sophistication of courts abroad.[7]

## B. *Scope of Article 3(a).*

The Supplementary Treaty openly alters this traditional practice. It requires judges to shun extradition if the accused either establishes that the request "has in fact been made with a view to try or punish him on account of his race, religion, nationality or political opinions," or if he proves that "he would, if surrendered, be prejudiced at his trial or punished, detained or restricted" on account of any of these factors. Supplementary Treaty, art. 3(a). These phrases cannot be brushed aside as a series of scrivener's errors: to the exact contrary, Congress intended the words to authorize inquiry into the attributes of a country's justice system as that system would apply to a given individual. *See* S.Exec.Rep. No. 17, *supra,* at 4–5; 132 Cong.Rec. 16,798–803 (1986). Moreover, Congress evidently knew that its command reversed years of extradition practice forbidding judicial investigation into such areas. *See* 132 Cong.Rec. 16,800 (1986) (describing article 3(a) as "a very broad, and far reaching provision"); *id.* at 16,806 (labelling this aspect of the treaty "historic").

Still, the article 3(a) defense, though a refreshing zephyr to persons resisting extradition, is not of hurricane force; its mere invocation will not sweep aside all notions of international comity and deference to the requesting nation's sovereignty. At least four principles rein in the winds of change. First, elementary rules of construction dictate that the defense not be construed so expansively as to negate the remainder of the treaty. *See, e.g., Factor,* 290 U.S. at 292–93, 54 S.Ct. at 195. The rule of noninquiry developed from the assumption that an extradition treaty, by its very existence, constitutes a general acceptance of another country's legal system. *See supra* Part V(A). By like token, the existence of an overall agreement on extradition must inform the workings of the article 3(a) defense, limiting its applicability to specific problems encountered by specific respondents, as opposed to general grievances concerning systemic weaknesses inherent in every case. Otherwise, the extradition treaty actually becomes an impediment to extradition, in other words, a non-extradition treaty. *See* 132 Cong.Rec. 16,607 (1986).

Second, controlling precedent requires that, where possible, we interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories:

> [Treaties] should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason, if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred.

---

**6.** The government suggests that the Constitution mandates the rule of noninquiry. We disagree. The rule did not spring from a belief that courts, as an institution, lack either the authority or the capacity to evaluate foreign legal systems. Rather, the rule came into being as judges, attempting to interpret particular treaties, concluded that, absent a contrary indication in a specific instance, the ratification of an extradition treaty mandated noninquiry as a matter of international comity. No doubt the rule exemplifies judicial deference to executive authority, *see Koskotas,* 931 F.2d at 174, but it is a deference stemming

at least in part from the fact that the executive is the branch which most likely has written and negotiated the document being interpreted.

**7.** The judiciary has, however, explicated a number of other limitations on extradition. *See, e.g., Manzi,* 888 F.2d at 207 (explaining that the principle of double criminality bars extradition unless the offense is a crime in both countries); *Quinn,* 783 F.2d at 792–810 (discussing origin of, and basis for, political offense exception in extradition proceedings).

*Factor,* 290 U.S. at 293–94, 54 S.Ct. at 195–96. These principles of reciprocity and liberal construction have particular force here because the United States, unlike the U.K. and certain other nations, has no available machinery for prosecuting those who commit crimes abroad but who are, nonetheless, non-extraditable. *See* 132 Cong.Rec. 16,587 (1986).

■ Third, article 3(a) requires an accused to establish that he would, if surrendered, be "prejudiced" on account of particular factors. In our view, this word denotes that only those preformed ideas relative to race, nationality, and the like which are of sufficient magnitude actually to affect the accused's situation, *i.e.,* to "prejudice" him, trigger the special prophylactic protections of the Supplementary Treaty.

■ Finally, the legislative history suggests that, in insisting upon the inclusion of article 3(a), the Senate was concerned largely with the special Diplock court system applicable to those accused of terrorist acts in Northern Ireland. *See* 132 Cong.Rec. 16,-806–19 (1986). There is no indication that the defense was meant as a slur upon, much less an indictment of, the British legal system.

■ For these four reasons, we conclude that the soil of this case is particularly inhospitable to a rambling interpretation of article 3(a). We hold, therefore, that, in order to avail himself of the article 3(a) defense, an extradition target must establish by a preponderance of the credible evidence that, if he were surrendered, the legal system of the requesting country would treat him differently from other similarly situated individuals because of his race, religion, nationality, or political opinions. It is not enough simply to show some possibility that preformed ideas might exist; rather, under the terms of the Supplementary Treaty, the bias must rise to the level of prejudicing the accused. *See generally* William M. Hannay, *Committee Report: An Analysis of the U.S.–U.K. Supplementary Extradition Treaty,* 21 Int'l Law. 925 (1987).

## C. Appellant's "Per Se *Prejudice*" Argument.

■ We now face the task of applying the prejudice standard in this case. The record reveals that the magistrate paid careful attention to an array of facts that sometimes pointed in different directions. For instance, he found that there were some negative articles about Howard, that some Britons might be biased against black Americans, and that the U.K. does not utilize a voir dire procedure to screen venirepersons. Nonetheless, in the magistrate's eyes, these facts did not establish an article 3(a) defense because countervailing considerations mitigated their negative impact, rendering any bias *de minimis.* Appellant excoriates this finding, complaining that. it rests upon a faulty legal premise. He asserts that article 3 effectively eclipses the rule of noninquiry; that the evidence he tendered constitutes *per se* proof of prejudice which irrebuttably establishes an article 3(a) defense; and that the Supplementary Treaty does not countenance consideration of countervailing factors in mulling whether a defense is extant. We concur with the magistrate that the Supplementary Treaty stakes out a middle ground between the classic rule of noninquiry and the total abolition of that rule: the treaty alters the traditional formulation of the rule while simultaneously preserving many aspects of it. Any other interpretation would run afoul of the four constraining principles we have identified. *See supra* at 1330–31.

One manifestation of this middle position is that article 3(a), as we read it, imposes a *de minimis* threshold requirement relative to the existence of prejudice. For example, because international criminal affairs are frequently high profile, a *per se* rule barring extradition whenever there has been any negative publicity would undermine the entire treaty by making successful article 3(a) defenses virtually automatic and relegating extradition to a few fringe instances. We do not think that the treaty partners intended so unproductive a result. Similar reasoning rules out any *per se* prohibition on extradition when the accused proffers evidence suggesting discordant race relations in the U.K.

or when he simply points to the absence of a specific procedural device.

Consequently, we hold that, while a magistrate considering the applicability of article 3(a) must weigh each of the factors cited by appellant if an extradition target offers proof that they exist, their mere presence, without more, does not conclusively establish an article 3(a) defense.[8] The something "more," as we have indicated, is prejudice to the extradition target. It follows that the magistrate correctly construed article 3(a) to require a showing of actual, respondent-specific prejudice.[9] Appellant's *per se* challenge to the magistrate's reasoning must, therefore, fail.

## VI. THE MERITS OF THE ARTICLE 3(a) DEFENSE

■ This brings us to the merits of Howard's fact-based challenge to the decision below—an issue that gives us some pause.[10] Nevertheless, in seeking to secure an article 3(a) defense, an extradition target bears a heavy burden. He must establish, by a preponderance of the evidence, that he *would*, if surrendered, be prejudiced on account of a proscribed factor. *See* Supplementary Treaty, art. 3(a); *see also* 132 Cong.Rec. 16,607 (1986). Having painstakingly reviewed the papers in the case in light of the burden of proof, we cannot say that clear error inheres.

Appellant introduced numerous newspaper articles, affidavits from several people living in Great Britain, and the testimony of Paul Stevenson, a senior executive officer of England's Commission for Racial Equality, in an attempt to establish that widespread publicity would prevent him from receiving fair treatment abroad. But, this evidence comprises a mixed bag. It is true that some of the press clippings contained racial innuendo. On the other hand, the publicity was mercifully brief in duration, for the most part lasting less than a week; the U.K.'s Contempt of Court Act has been invoked and will cut off any further untoward publicity; Howard's counsel himself created some of the notoriety in his rousing remarks to the British press; the media coverage was not uniformly or overwhelmingly negative (indeed, some of the newspaper articles describe appellant favorably); and, finally, the publicity occurred over two years ago and will be very old news when and if appellant eventually comes to trial in England. On this conflicted record, the magistrate did not perpetrate clear error in finding that a spurt of mixed publicity created in part by appellant's counsel and occurring years ago failed to rise to the level of prejudice necessary to sustain an article 3(a) defense.

The evidence in the record concerning the supposed shortcomings of the requesting nation's legal system does not require a different result for it, too, is mixed. Admittedly, appellant presented affidavits and testimony suggesting that preformed ideas constitute a particular threat in the circumstances of this case because the English system does not provide for American-style voir dire of potential jurors. But, evidence submitted by the government and elicited from appellant's witness on cross-examination indicates that the English legal system has a host of other mechanisms which will be available to appel-

---

**8.** This interpretation finds analogies in prevailing federal court practice. For instance, we have routinely held that the mere presence of differing procedural devices, pretrial publicity, or allegations of community prejudice, without more, does not warrant overturning a criminal conviction. *See, e.g., Neron v. Tierney*, 841 F.2d 1197, 1199 (1st Cir.) (admonishing against the use of habeas corpus to superimpose federal procedural choices upon state courts merely because the federal court thinks some "other" procedure might be "better"), *cert. denied*, 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); *United States v. Reveron–Martinez*, 836 F.2d 684, 687 (1st Cir.1988) (ruling that pretrial publicity, even though pervasive and negative, did not warrant a presumption of prejudice); *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir.1978) (explaining that the mere existence of community prejudice, in and of itself, does not necessitate relief).

**9.** We note, in passing, that the rules governing criminal trials in the federal courts seem fully compatible with such a requirement. *See, e.g.,* Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

**10.** We refer only to appellant's claim that, if extradited, he would be prejudiced on account of his race. He presented little, if any, evidence suggesting the existence of nationality-based biases in this case, and we cannot discern any error (clear or otherwise) in the magistrate's finding that appellant failed to prove cognizable prejudice of this genre.

lant and which mitigate the absence of voir dire. Appellant will be able to present his arguments concerning the impact of pretrial publicity and race relations during committal proceedings in the U.K. He may then renew the arguments by requesting pretrial review at the Crown Court, again before the trial judge, and still again on appeal from any conviction. In addition, the English system provides for self-excusal of potentially biased jurors and trial judges are duty bound to offer detailed jury instructions concerning the impropriety of grounding defendants' convictions on extraneous considerations. Seen in this light, the absence of voir dire in the English system is not of decretory significance. After all, courts must not let jingoism run amok, but, rather, must turn a sympathetic ear to other nations' independent judgments about how best to ensure fairness in dealing with criminal matters. The United States has no monopoly on even-handed justice.

To summarize, the evidence concerning prejudice, properly decanted, is ambivalent. The facts we have catalogued, and others in the record, comprise adequate support for the magistrate's conclusion that any evidence of bias relating to appellant's race is so exiguous as not to animate article 3(a). Put another way, the magistrate weighed the proof, drew a series of reasonable (albeit not inevitable) inferences from it, and concluded that appellant had not carried the burden of proving prejudice. We cannot say that this choice between two plausible alternatives, each of which finds support in the record, constitutes clear error. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *United States v. Rodriguez–Morales,* 929 F.2d 780, 784 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).

## VII. CONCLUSION

We need go no further.[11] Article 3 of the Supplementary Treaty significantly alters

the pattern of procedural avenues and substantive rights traditionally available in extradition cases. While these alterations reconfigure the extradition landscape, they do not render it impassable. Following the map that Article 3 supplies, we conclude that we have jurisdiction to consider appellant's claims; that the standard of review governing his legal challenge is *de novo;* that the standard of review governing his fact-based challenge is for clear error; that appellant's arguments anent the scope of the article 3(a) defense envision a grandeur which lacks support in the treaty's language or in the applicable law; and, that, in the last analysis, the magistrate's findings of fact derive enough support from the record to withstand attack. Accordingly, the district court lawfully upheld the magistrate's issuance of a certification of extraditability.

*Affirmed.*

LEVIN H. CAMPBELL, Senior Circuit Judge (concurring).

While joining in the court's opinion, I am troubled by our resolution of the "successive appeals" issue. Article 3(b) provides that a finding concerning an Article 3(a) defense, involving race, religion, nationality, or political opinion, "shall be immediately appealable by either party to the United States district court, or court of appeals, as appropriate." We hold that this unclear language does not indicate that an appellant receives only *one* appeal—i.e., an appeal to the district court, if the initial extradition decision was by a magistrate, *or an* appeal to the court of appeals if the initial extradition decision was by a district judge—but rather was meant to provide, however clumsily, for the full federal appellate process. Thus, where as here the initial extradition decision was by the magistrate, appellant can appeal, (1) to the United States district court; (2) from the district

---

11. We do not tarry over the assertion that the magistrate erred in denying appellant's motions to stay proceedings and to supplement the evidence. These motions were addressed to the magistrate's discretion, and he provided ample reasons for their denial. In the same vein, we see no error in the magistrate's discretionary

decision allowing the government to file confirmatory materials out of time. On this score, the sockdolager is that appellant neither sought to reopen the record to counter or contest the belated evidentiary proffer nor requested time for this specific purpose. He cannot now be heard to complain that he had no chance to respond.

court to this court; and, I assume, (3) from this court to the Supreme Court by writ of certiorari.

It is sad but true that this interpretation of the ambiguous language—while seemingly what was intended—creates significant new opportunities for persons to delay their extradition. Historically, extradition decisions by a judge or magistrate were not appealable, thus avoiding the potential delays which often attend appellate review. Obviously, the more extradition is susceptible to being bogged down in endless procedural maneuvering, the greater the danger that essential witnesses to the charged crime may die or disappear and their memories fade prior to trial. It used to be thought that the interest of another civilized nation in enforcing its criminal law entitled it to the reasonably prompt extradition of accused persons. The present appeal to this court has enabled appellant to delay trial in Great Britain by another year or more.

It would have been useful had the United States of America gone more deeply, in its briefs before us, into the pros and cons of the proper interpretation of Article 3(b). In a Treaty case of first impression, the interpretation espoused by the Attorney General can be enlightening. As best I can tell, the Attorney General *agrees* with the court's reading of the Treaty, i.e., that the full federal appellate process, and not a truncated version, was intended. However, the alternative interpretation—what my colleagues call the "one bite of the apple" approach—has some appeal given Article 3(b)'s literal language and the long tradition divorcing extradition from the normal appellate process. We could have benefited from a more considered explication of all this by the United States.

In any event, I write separately in order to emphasize the implications of Article 3(b), as we now interpret it, so that the drafters of future provisions will have no illusions concerning the inevitable potential for delay, and may decide whether other approaches would be desirable.