**In the Matter of the Requested EXTRADITION of James Joseph SMYTH.**

**No. CR 92–0152 MISC BAC.**

United States District Court, N.D. California.

June 30, 1993.

---

Mark N. Zanides, Asst. U.S. Atty., San Francisco, CA, for plaintiff.

Karen Snell, Asst. Federal Public Defender, San Francisco, CA, for defendant.

### MEMORANDUM AND ORDER

CAULFIELD, District Judge.

### INTRODUCTION

On September 14, 1992, the United Kingdom filed a formal request for the extradition of James Joseph Smyth to serve the remainder of his sentence for a 1978 conviction in Belfast, Northern Ireland.[1] Smyth has indicated that he will raise a defense to extradition pursuant to Article 3(a) of the Supplemental Extradition Treaty between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland, which went into effect on December 23, 1986 ("Supplemental Treaty") which provides:

Notwithstanding any other provision of this Supplemental Treaty, *extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial* authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race,

religion, nationality, or political opinions, or that he would, *if surrendered, be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions* (emphasis added).

On May 6, 1993 this court issued an order outlining the permissible scope of the extradition hearing in this matter under Article 3(a), 820 F.Supp. 498. The parties are now before the court on Smyth's Second Request for the production of documents.

### BACKGROUND

Smyth's second discovery request seeks a number of documents which he contends supports his claim that he will be "punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions" if surrendered. This court has previously outlined the scope of the permissible inquiry on this issue in its May 6th order:

Evidence that Mr. Smyth himself would be subject to restraints on his liberty upon release from the Maze, or at risk of assassination is not admissible absent a showing that the government has explicitly tolerated or has been materially involved in any plots to restrain his liberty or assassinate him. Evidence that individuals who had previously served time in the Maze were restrained in their personal liberty or assassinated upon their release will not be admissible absent some showing of a pattern of conduct involving a government entity. For example, the court would consider the introduction of such evidence upon a showing under F.R.E. 104 that individuals who had religious or political views substantially similar to Smyth, and who had been convicted of either murder or attempted murder of "security" personnel (prison guards, security forces, etc.) were disproportionately restricted in their liberty or assassinated upon their release from the Maze and that a government

---

1. The underlying facts of this case are fully set forth in this court's written decision regarding defendant's request for bail and need not be restated here. *See United States v. James Joseph*

*Smyth,* 795 F.Supp. 973 (N.D.Cal.1992), *rev'd on other grounds sub nom, In re Extradition of Smyth,* 976 F.2d 1535 (1992).

entity was involved in the action directly or indirectly.

Order at 9:19–10:7.[2]

Smyth's second discovery request seeks the following documents and reports which he maintains are essential to meet his burden of proof under Article 3(a):

1. *The Kincora Report:* The court has already ruled that this document appeared to be irrelevant. The court has not ordered that the United Kingdom ("UK") produce this document.

2. *The Stalker–Sampson Reports:* The Stalker–Sampson reports arise out of the investigation of officers in the Royal Ulster Constabulary ("RUC") for the shooting deaths of six people in 1982 whom they suspected of being members of the IRA. The purpose of the inquiry was to determine whether or not criminal offenses (involving, *inter alia,* the giving of false or misleading evidence and conspiracy to pervert the course of justice) had been committed. The investigation was originally led by Mr. John Stalker, deputy chief constable of Manchester. Shortly after Mr. Stalker submitted an interim report in September of 1985, he was relieved of his duties and replaced by Colin Sampson, the chief constable of West Yorkshire. The UK maintains that the reports contain highly sensitive information regarding internal affairs investigations and the procedures and identity of security forces personnel.

3. *The Kelly Report:* In 1988, Charles Kelly, the Chief Constable of Staffordshire, was appointed to consider whether disciplinary charges should be brought against RUC officers of the rank of chief superintendent and below who had been identified by Stalker and Sampson as having committed criminal offenses, including murder. The declarations of Patrick Mayhew, the Secretary of State for Northern Ireland, filed on June 7, 1993 and June 18, 1993, do not specifically invoke a state secret or national security privilege

claim with respect to this report. Instead, Mr. Mayhew states that "[t]he public interest here is in the maintenance of an honorable, disciplined, law-abiding and incorrupt police force." Mr. Mayhew's declarations not only fail to specify that he has read the report[3], but they also fail to specify that the report contains any state or national secrets.

4. *The Stevens Inquiry:* In 1989 the chief constable of the RUC, in consultation with the chief constable of Cambridgeshire, appointed the deputy chief constable of Cambridgeshire, John Stevens, to carry out an investigation into allegations of collusion between members of the Security Forces and Loyalist paramilitaries. As a result of the investigation, the RUC confirmed that Security Forces personnel had disclosed to Loyalists photos of republican suspects and the names, addresses and photographs of more than 400 people from the Catholic community in Northern Ireland. With respect to the Steven's Report, Mr. Mayhew's June 7, 1993 declaration states:

> So far the actual report is concerned, I am satisfied that its disclosure would be injurious on two grounds; firstly the integrity of the process of criminal investigations and the making of decisions as to prosecutions and secondly, the efficacy of the efforts of the Government of the United Kingdom to counter terrorism and the protection of persons involved in those efforts.

A summary of this report has been disclosed to Smyth; however, the court finds that the summary does not contain sufficient detail to aid Smyth in preparing his defense.

5. *The Nature of Information on Ex–Prisoners Available to Security Forces*

Smyth requests a statement of the information computerized and available to security forces on the street concerning the citizens of Northern Ireland, particularly ex-prisoners.

**2.** The reference to specific types of admissible evidence was not intended to limit evidence Smyth may produce but were intended to illustrate for the parties examples of the types of evidence within the scope of the extradition hearing.

**3.** The UK has also submitted the declaration of James Edmund McIvor, Detective Chief Superintendent of the RUC, in support of its position. While Mr. McIvor does specify that he has read the Kelly report, his declaration does not address privilege issues.

■ 6. *Sinn Fein Office Murders:* Mr. Smyth requests reports of the investigation conducted by the government into the murder of three Sinn Fein members in 1992. This request is DENIED. Absent some showing that the government was implicated in these murders, information about the government's investigation of the murders is not discoverable.

■ 7. *Religious Background of Security Forces:* This request is DENIED.

8. *Disciplinary Measures Taken Against Guards After the Escape*

■ The UK maintains that no such measures were taken because of the failure of inmates to cooperate with investigations. In the absence of evidence to the contrary, no further documents need be produced in connection with this request.

The government of the United Kingdom, through the United States Attorney's office for the Northern District of California, has refused to produce any of the above-referenced documents to Mr. Smyth. The UK has also refused to permit an *in camera* review of the documents by the court.

### I. *Discovery in Extradition Proceedings*

The Ninth Circuit has held that although "there is no explicit statutory basis for ordering discovery in extradition hearings, *see Merino v. United States Marshal,* 326 F.2d 5, 12–13 (9th Cir.1963), *cert. denied,* 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046 (1964), the extradition magistrate has the right, under the court's 'inherent power' *see First National City Bank of New York v. Aristeguieta,* 287 F.2d 219, 226 (2d Cir.1960), *vacated as moot,* 375 U.S. 49, 84 S.Ct. 144, 11 L.Ed.2d 106 (1963), to order such discovery procedures 'as law and justice require, *Jhi-*

*rad v. Ferrandina,* 536 F.2d [478] at 484 [2nd Cir.1976].'" *Quinn v. Robinson,* 783 F.2d 776, 817 n. 41 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).

This court has already held that under Article 3(a), Smyth may produce evidence that similarly situated individuals (Catholic nationalists), who had previously served time in the Maze were restrained in their personal liberty or assaulted upon their release upon some showing of a pattern of conduct on the part of a governmental entity. In light of the inquiry provided for in Article 3(a), and Smyth's burden in establishing his defense to extradition, the court views that discovery regarding the treatment of other Irish, Catholic nationalists is imperative to his defense.

### II. *The Government's Objections to Discovery*

The UK does not dispute that under this court's inherent power, the court has the authority to order such discovery procedures as "law and justice" require. Instead the UK objects to Smyth's discovery request on relevance and privilege grounds.[4]

#### 1. *Relevance*

■ Except as indicated above, the court finds that a review of the descriptions of the requested documents provided by both Smyth and the UK indicates that the documents in question are discoverable. All of the documents requested address the issue of the government's direct or indirect involvement with the murder, attempted murder and other harms directed at Catholic nationalists. The UK confuses the issues regarding relevance for discovery purposes as opposed to trial. The standard is not whether

---

4. While the UK does not take issue with this court's power to grant discovery, the UK, relying on selective prosecution cases, does argue that there is no legal basis for ordering discovery for Smyth to make his showing that a class of similarly situated persons has been restricted or injured disproportionately by the government. Contrary to the UK's assertion, the selective prosecution cases are not analogous. In *United States v. Bourgeois,* 964 F.2d 935 (9th Cir.1992), the Ninth Circuit made clear that discovery in selective prosecution actions, which compels the courts to second-guess prosecutorial decisions, requires a high discovery threshold. *Id.* at 939. The court's ruling was based on two considerations; first, that courts are ill-equipped to assess a prosecutor's charging decisions; and, second, such court oversight over prosecutorial decision-making processes could undermine effective law enforcement. *Id.* In contrast, the inquiry sought by Smyth is exactly the type envisioned by the Senate's ratification of Article 3(a). *See* analysis which follows.

the information requested will be admissible at trial, but rather, is the information requested relevant to the subject matter of this extradition proceeding. *See Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 388–89, 91 L.Ed. 451 (1947).

While neither the Federal Rules of Civil or Criminal Procedure are directly applicable to these proceedings, both rules provide guidance to the court in the exercise of its inherent power. Fed.R.Crim.P. 16(a)(1)(C) provides:

> (C) *Documents and Tangible Objects.* Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are *material to the preparation of the defendant's defense* or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant. (Emphasis added.)

Similarly, Fed.R.Civ.P. 26(b)(1) provides as follows:

> (b) *Discovery Scope and Limits.* Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
>
> (1) *In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge or any discoverable matter. It is not ground

for objection that the information sought will be inadmissible at the trial if the *information sought appears reasonably calculated to lead to the discovery of admissible evidence.* (Emphasis added.)

After a review of the description of the documents in question, the court finds that the documents are relevant for discovery purposes under either standard. The information is material to the preparation of the Mr. Smyth's defense under Fed.R.Crim.P. 16(a)(1)(C) because the information may support a showing of discriminatory treatment of persons similarly situated to Mr. Smyth as defined in Article 3(a) of the Supplemental Treaty, and the involvement of the government of the UK in that treatment. The information appears reasonably calculated to lead to the discovery of admissible evidence, under Fed.R.Civ.P. 26(b)(1), of disparate treatment under Supplemental Treaty Article 3(a) and the involvement of the government of the UK in that treatment.

**2. *State Secret, Deliberative Process and Investigatory Files Privilege***

On June 7, 1993, the UK filed its response to Smyth's Second Request for Documents in which it invokes the state secret, deliberative process and investigatory privileges with respect to Stalker–Sampson and Stevens reports. The UK invokes the investigatory files privilege with respect to the Kelly report.[5]

 The United States Supreme Court outlined the requirements which must be met in invoking the state secret privilege in *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). In *Reynolds,* the Supreme Court specified that the state secret privilege belonged to the government and was not to be lightly invoked. The Court went on to state:

> There must be a formal claim of privilege, lodged by the head of the department

---

5. The UK cites *Friedman v. Bache Halsey Stuart Shields, Inc.,* 738 F.2d 1336, 1341 (D.C.Cir. 1984); *Brown v. Thompson,* 430 F.2d 1214 (5th Cir.1970) in support of the claim of investigatory privilege for police investigation files. The UK however, acknowledges that such a privilege lasts for only a "reasonable time." *Brown,* 430 F.2d at 1215. The declarations in support of the

UK's claims of privilege were vague in their attempts to make distinctions between the types of privileges. Neither the declarations nor the UK's memorandum in response to Smyth's discovery requests specifically address whether the Kelly report continues to be entitled to any investigatory privilege.

which has control over the matter, after actual personal consideration by that officer. The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect.

While courts should accord great deference to a government's assertion of the state secret privilege, (*See Halkin v. Helms,* 598 F.2d 1, 9 (D.C.Cir.1978), "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." *Id.* at 9; *In re United States of America,* 872 F.2d 472, 474 (D.C.Cir.1989). The Supreme Court has stopped short of advocating *in camera* review of all documents for which a claim of state secret is asserted. In fact, the opposite appears to be the case; the court should refrain from seeking disclosure of such documents so long as the court is satisfied, from the evidence presented, that a reasonable danger to the national security would result from disclosure of the information. *Reynolds,* 345 U.S. at 10, 73 S.Ct. at 533. Instead, where possible, assertions of the state secret privilege should be decided on declarations filed in support of the claimed privilege. The declarations provided to the court by the UK are insufficient for the court to determine whether the circumstances are appropriate for the claim of privilege.

Mr. Smyth's claim that he will be harmed as a result of the government's action is corroborated by evidence regarding the experiences of similarly situated individuals. Accordingly, the court views that Mr. Smyth has made a strong showing of necessity for disclosure. "Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake". *Reynolds,* 345 U.S. at 11, 73 S.Ct. at 533.

In light of Smyth's strong showing of need for the documents and the vagueness of the UK's declarations invoking privileges from production, the court viewed that an *in camera* review of the documents was necessary. Moreover, as Mr. Smyth could make no specific showing about the conclusions reached in the various reports without their production, the court found that an *in camera* review was necessary in order to balance the government's claims of privilege against Smyth's need for the documents. The court welcomed any suggestions from the UK regarding the redaction of particularly sensitive information regarding the identity or activities of security forces personnel. In response, the UK has indicated that it would not be possible to redact the documents and declined to submit the documents for *in camera* review by the court.

■ As a claim of state secret is to be decided without review of the subject documents, it is incumbent upon the party asserting the privilege to make some showing regarding the potential injury to the national security should the information in question be disclosed. *In re United States,* 872 F.2d at 474–475. The UK asserts that the disclosure of the requested information would be injurious to national security in that it would expose the internal affairs investigations of the security forces, as well as the organization and operation of the highly sensitive security force procedures. The UK has met its burden in establishing, through declaration, the existence of the privilege with respect to the Stalker–Sampson and Stevens reports. That there exists in Northern Ireland conflicts of significant proportions has been well-documented throughout the course of these proceedings. However, in this court's estimation, with the exception of the Stalker–Sampson and Stevens reports, the UK has not made a sufficient showing that the documents in question materially disclose any information with respect to the current personnel and operations of the security forces.[6]

III. *Balancing of Interests and Discovery Sanctions*

■ The court must now balance Mr. Smyth's need for the Stalker–Sampson and

---

**6.** As stated above, the UK does not specifically assert the state secrets claim with respect to any other documents. The declarations do not support any of the other privileges asserted for the other documents, information and reports.

Stevens reports against the UK's claim of privilege. The court must also consider an appropriate discovery sanction for the failure of the UK to provide documents for which they do not claim a privilege and which this court has ruled relevant for purposes of discovery. Dismissal for failure to comply with a discovery order is a weighty sanction. The government points out that the requested information does not appear to address activities which have occurred during the last four years. Moreover, while the information appears facially relevant from the descriptions, it would be impossible to determine the full scope of the documents' relevancy without an *in camera* review.

Under the record presented here, neither the balancing of Mr. Smyth's interest as against the UK's claim of state secret privilege for the Stalker–Sampson and Stevens reports, nor the discovery sanctions for failure to produce non-privileged documents warrants dismissal.

The effect of a valid, or invalid claim of privilege on the outcome of this matter depends on the relevancy of the information presented by a claimed privilege. *In re United States,* 872 F.2d at 476. Smyth seeks the information to bolster his claim that he will be subjected to harm, or killed, as a result of governmental actions if returned. There has been no showing that the information requested could be obtained from alternative sources. Accordingly, the court must balance the UK's stated need for confidentiality against the individual's need for information which could potentially support his defense against extradition. *See U.S. v. Reynolds, supra.*

Balancing those interests, the court views that the most appropriate remedy is to grant Mr. Smyth a rebuttable presumption with respect to the UK's treatment of Catholic nationalists.

### ORDER

For the foregoing reasons, and good cause appearing therefrom, the court grants Smyth the following presumption:

(1) Catholic Irish nationals accused or found guilty of offenses against members of the security forces or prison officials are subjected systematically to retaliatory harm, physical intimidation and death in Northern Ireland.

(2) Members of the security forces in Northern Ireland either participate directly or tacitly endorse these actions.