61 F.3d 711
 95 Cal. Daily Op. Serv. 5875, 95 Daily Journal
D.A.R. 10,012
In the Matter of the REQUESTED EXTRADITION OF James Joseph SMYTH.
UNITED STATES of America, Plaintiff-Appellant,
v.
James Joseph SMYTH, Defendant-Appellee.
 No. 94-10495.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 10, 1995.
Decided July 27, 1995.
As Amended Dec. 11, 1995.*
 
 Sara Criscitelli, U.S. Dept. of Justice, Washington, DC, Mark N. Zanides, Asst. U.S. Atty., U.S. Dept. of Justice, Oakland, CA, for plaintiff-appellant.
 Karen L. Snell, Asst. Federal Public Defender, San Francisco, CA, for defendant-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before: SNEED, SCHROEDER, and FERGUSON, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 This is a proceeding brought by the United States on behalf of the United Kingdom to extradite James J. Smyth to Northern Ireland. Smyth was convicted of the attempted murder of a prison officer in Belfast, Northern Ireland in 1978 and sentenced to 20 years' imprisonment. He escaped from the Maze Prison in Northern Ireland in September of 1983 and arrived in San Francisco several months later. The United States, at the request of the United Kingdom, seeks Smyth's extradition to Northern Ireland to serve the remainder of his prison term. Extradition is sought pursuant to the United States-United Kingdom Extradition Treaty, June 8, 1972, U.S.-U.K., 28 U.S.T. 227, and the Supplementary Extradition Treaty, June 25, 1985, U.S.-U.K., art. 3(a), reprinted in S.Exec.Rep. No. 17, 99th Cong., 2nd Sess. 15-17 (1986) (Supplementary Treaty).
 
 
 2
 The district court denied certification of extradition. This government appeal requires our court, for the first time, to examine the unique defense to extradition found in the 1986 Supplementary Extradition Treaty between the United States and the United Kingdom. See Supplementary Treaty. The Supplementary Treaty followed in the wake of a series of decisions by United States courts refusing to extradite to Northern Ireland individuals who had been charged with or convicted of acts of political violence. The treaty provisions, negotiated by President Reagan and Prime Minister Thatcher, and modified by the United States Senate, represent a difficult compromise between outrage and compassion: the outrage of the British government over the refusal of the United States to extradite persons whom the United Kingdom considered terrorists, and the compassion of the United States for individuals who, if extradited, might suffer unfair treatment and incarceration on account of their religious or political associations, not because of their criminal acts.
 
 
 3
 The Supplementary Treaty's key substantive provision, Article 3(a), creates a defense to extradition. It provides:
 
 
 4
 Notwithstanding any other provision of this Supplementary Treaty, extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality or political opinions, or that he would, if surrendered, be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions.
 
 
 5
 Supplementary Treaty, art. 3(a).
 
 
 6
 The only other court of appeals decision that has construed the Supplementary Treaty's Article 3(a) defense is In Re Extradition of Howard, 996 F.2d 1320 (1st Cir.1993), which upheld extradition of an individual to England for trial. The First Circuit held that Article 3(a) was drafted with an eye to the discriminatory practices of the special Diplock court system applicable to those accused of terrorist acts in Northern Ireland, rather than aimed at the British legal system generally. Id. at 1331. The Howard court affirmed a ruling that the extraditee, a black man, would not suffer discrimination within the meaning of Article 3(a) if returned to England for trial on rape charges. Id. at 1332-33. In this case, we face a request for extradition to Northern Ireland of a person convicted of a crime that the U.K. regards as an act of terrorism.
 
 
 7
 Smyth was one of 38 Republican prisoners who made the 1983 escape from the Maze, a Northern Ireland maximum security prison. He arrived in San Francisco, California, and lived and worked in the Bay area until June 3, 1992, when he was arrested on a charge of making a false statement on a passport application in violation of 18 U.S.C. Sec. 1542, and taken into custody. On September 14, 1992, the U.K. filed a formal request for Smyth's extradition to serve the remainder of his sentence for the 1978 attempted murder conviction.
 
 
 8
 The district court held numerous hearings in the matter and eventually ruled that Smyth would, if extradited, face discriminatory detention and punishment both within the Maze Prison and upon his release into the general population. The court therefore denied the government's request for the certification of extradition. Neither the validity of Smyth's underlying conviction for attempted murder nor his 20-year sentence are challenged on appeal.
 
 
 9
 We have jurisdiction because the Supplementary Treaty provides for a right of direct appeal from district court extradition decisions made pursuant to Article 3(a). See Supplementary Treaty, art. 3(b). We reverse the district court because we hold that the record does not establish by a preponderance of the evidence that this extradition will lead to detention and punishment on account of Smyth's race, religion, nationality, or political opinions rather than on account of his conviction for attempted murder.
 
 
 10
 The legal proceedings in this case must be viewed against the backdrop of recent Irish history, and the Supplementary Treaty's unique provisions for judicial inquiry into the potential effects of a requested extradition to Northern Ireland.
 
 The Supplementary Extradition Treaty
 
 11
 The record in this case bears out the violence that has racked Northern Ireland in the latter part of this century over whether Northern Ireland should remain a part of the United Kingdom or be joined with the Republic of Ireland. This has been a bloody struggle fueled by religion-political tensions. Both the Catholic "Republicans," a subset of the "Nationalists" (those who desire a united Ireland), and the Protestant "Loyalists," a subset of the "Unionists" (those who desire Northern Ireland to remain part of the U.K.), believe that the use of violence is a legitimate means of pursuing their respective goals. The Provisional Irish Republican Army ("IRA") of which Smyth reputedly is a member, has publicly announced that the British Army and persons who work for the Army are targets. The district court found that IRA activity has accounted for most of the political violence the country has endured in recent years: "[g]overnment sources estimate that 97% of the 1,726 bombings and two-thirds of the shootings relating to the political violence in Northern Ireland were done by Republican terrorists in the 1987-1992 period."
 
 
 12
 Beginning in the early 1970s, the government of the United Kingdom determined that a state of emergency existed in Northern Ireland and enacted extensive emergency provisions. Abbreviated trial procedures, including elimination of the right to a jury trial, were authorized and instituted following the report of Lord Diplock that fewer protections for defendants' rights were justified to deal with terrorist activities in Northern Ireland. The Diplock Commission's recommendations were "incorporated wholesale into the Emergency Provisions Act of 1973." Note, Just Say No! United States Options to Extradition to the North of Ireland's Diplock Court System, 12 Loy.L.A. Int'l & Comp.L.J. 249, 257 (1989). These provisions have been amended and reenacted in subsequent legislation and are still in force in Northern Ireland today. Id. at 257-258.
 
 
 13
 The district court found that these provisions include the grant of authority to security forces to detain persons for questioning without reasonable suspicion of criminal activity. Longer internments may be authorized for persons suspected of commission of terrorist activity. Membership in either Loyalist or Republican paramilitary organizations, such as the IRA, is a crime. The Emergency Provisions Act has enabled courts in Northern Ireland to weaken the procedural safeguards that guarantee a "fair trial" in most common law jurisdictions and thus derogate from the minimum standards established under the European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 221. See Just Say No, supra, at 258-267.
 
 
 14
 If this were a traditional extradition, we likely would not concern ourselves with the operation of the justice system in Northern Ireland. The long-standing "rule of noninquiry" has traditionally circumscribed the breadth of a court's inquiry into such matters. Under that doctrine, "[a]n extraditing court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country." Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir.1983). Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems. See Michael P. Scharf, Foreign Courts on Trial: Why U.S. Courts Should Avoid Applying the Inquiry Provision of the Supplementary U.S.-U.K. Extradition Treaty, 25 Stan.J.Int'l L. 257, 269 (1988). ("[T]he State Department is in a superior position to consider the consequences of a nonextradition decision upon foreign relations than the courts and it has diplomatic tools, not available to the judiciary, which it can use to insure that the requesting state provides a fair trial.").
 
 
 15
 Courts have acknowledged an exception to the noninquiry rule, however, when the extraditee is accused of a political crime. See Quinn v. Robinson, 783 F.2d 776, 787 (9th Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); see also Restatement (Third) of The Foreign Relations Law of the United States Sec. 476(2) (1986) (hereinafter Restatement ). The extradition treaty negotiated in 1972 between the United States and the U.K. expressly provided that a signatory could refuse extradition if it regarded the offense "as one of a political character." See Extradition Treaty, June 8, 1972, U.S.-U.K. art. V(c)(i), 28 U.S.T. 227, 229.
 
 
 16
 Beginning in 1979, a series of United States court decisions denied extradition of IRA members because the underlying offenses constituted "political acts." See In re McMullen, No. 3-78-1899 M.G. (N.D.Cal.1979), reprinted in 132 Cong.Rec. 16,585 (1986); In re Mackin, No. 86 Cr.Misl., appeal denied, 668 F.2d 122 (2d Cir.1981); In re Doherty, 599 F.Supp. 270 (S.D.N.Y.1984). These decisions angered the British Government, which viewed them as condoning violent terrorist conduct.
 
 
 17
 The Reagan Administration in 1981 proposed legislation for a new treaty that would have entirely eliminated judicial application of the political offense exception to extraditions to the United Kingdom.[1] The Departments of Justice and State, both of whom assisted in drafting the original bill, expressed concern that continued judicial application of the political offense exception to extradition would turn the United States into a haven for terrorists and adversely affect foreign relations. See Barbara Ann Banoff & Christopher H. Pyle, "To Surrender Political Offenders": The Political Offense Exception to Extradition in United States Law, 16 N.Y.U.J. Int'l L. & Pol. 169, 170 (1984).
 
 
 18
 The Senate, however, was not comfortable with the wholesale elimination of the political offense exception from U.S.-U.K. extradition proceedings. It therefore limited the abrogation of the political offense exception in Article 1 of the Supplementary Treaty to enumerated violent offenses[2] and added Article 3(a) as a means by which fugitives sought for extradition on such offenses could nonetheless challenge their extradition.
 
 
 19
 The Senate Report described the Supplementary Treaty as "one of the most divisive and contentious issues the Committee [on Foreign Relations] has faced this Congress. The Committee has worked long and hard to develop a compromise that can win broad, bipartisan support." S.Exec.Rep. No. 17, 99th Cong., 2d Sess., 6 (1986). The Report further characterized the compromise as "an effort to balance anti-terrorism concerns and the right of due process for individuals." Id. at 3. As such, Article 3(a) is not a mere reformulation of the political offense exception; the provision invites an altogether new inquiry in the extradition context. Rather than focusing on the motivations of the accused (which the political offense exception encourages), the Article 3(a) defense to extradition focuses on the treatment the accused will likely receive at the hands of the requesting country's criminal justice system.
 
 
 20
 Even after the language of what is now Article 3(a) had been penned, the discussion of its proper interpretation continued. The most contested issue centered on how broad an inquiry into the operation of Northern Ireland's system of justice was to be authorized by the treaty's language. A colloquy inserted by the Senate Foreign Relations Committee into the Executive Report accompanying the Supplementary Treaty explained the Committee majority's view and that of the amendment's principal sponsor, Committee chairman Senator Lugar: that the inquiry should not be limited to the procedures utilized at trial.[3]
 
 
 21
 Article 3(a) clearly places the burden upon the person sought for extradition to establish "by a preponderance of the evidence" that the exception applies. Supplementary Treaty, art. 3(a). To establish a defense under the second clause of Article 3(a), the extraditee must establish that if surrendered, he would be "prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality, or political opinions." Id. The First Circuit aptly has characterized the provision as a compromise "placing most violent crimes beyond the political offense exception's reach but adding certain novel safeguards for the protection of potential extraditees." In re Extradition of Howard, 996 F.2d at 1324.
 
 District Court Proceedings
 
 22
 This is the first case in which a person challenging extradition to Northern Ireland has raised a defense under Article 3(a) of the Supplementary Treaty. Because of the lack of precedent, the district court held several preliminary hearings to decide the scope of the evidence that would be discoverable and admissible to support the Article 3(a) defense. On May 6, 1993, the district court issued its first written order in the case, In re Extradition of Smyth, 820 F.Supp. 498 (N.D.Cal.1993). The court ruled that Article 3(a) created an exception to, but did not nullify, the traditional rule of noninquiry in extradition matters and that it permitted an individual asserting the defense to establish that the individual would be prejudiced as a result of discriminatory treatment within the requesting country's criminal justice system. Id. at 501-02. The district court stated that it would not conduct a general examination of the fundamental fairness of the Diplock court system in Northern Ireland, limiting inquiry to the alleged past or future discriminatory treatment Smyth himself had received or would receive in the system. Id. at 501 (inquiry is "individual and case specific"). These basic rulings are not seriously challenged here.
 
 
 23
 The court went on to define the scope of permissible inquiry along lines which set the course of the litigation and shaped the nature of its ultimate findings. The court held that Article 3(a) authorized inquiry regarding three categories of evidence:
 
 
 24
 (1) evidence of Smyth's treatment by security forces prior to his 1977 arrest, admissible as "background [that could] tend to show a pattern of discriminatory treatment aimed specifically at ... Smyth," id. at 502;
 
 
 25
 (2) evidence of the conditions of confinement in Northern Ireland that Smyth would face, provided the evidence showed "that any poor treatment suffered is a result of discrimination on the basis of race, religion, nationality or political view," id. at 503; and
 
 
 26
 (3) evidence related to likely post-incarceration "restraints on ... liberty" motivated by the grounds listed in Article 3(a), admissible only if such evidence showed that the government "explicitly tolerated or has been materially involved in any plots to restrain [Smyth's] liberty or assassinate him" or if it showed a "pattern of [such] conduct involving a government entity," id. at 503.
 
 
 27
 Legal problems became thornier when the court proceeded to address specific discovery requests. Smyth sought discovery of several government documents that the U.K. refused to produce. Three such documents involved U.K. government-sponsored investigations into possible misconduct by police and security forces in Northern Ireland in the 1980s. These reports were known as the Stalker-Sampson Reports,[4] the Kelly Report[5] and the Stevens Report.[6] The U.K. objected to producing these documents on the grounds that they were irrelevant and protected by several privileges including the state secret privilege, deliberative process privilege and investigatory files privilege.
 
 
 28
 The discovery battle tended to bear out concerns expressed during the congressional debate that Article 3(a) would create sensitive discovery confrontations between United States courts and the British government. S.Exec.Rep. No. 17 at 8 (cautioning that "sensitive foreign policy issues may be involved even at the discovery stage"). The scholarly debate on this issue has ranged from the view that broad judicial discovery is fully appropriate, see Banoff & Pyle, supra, at 207-10, to the view that courts should refrain from any inquiry into the justice systems of the United Kingdom because such inquiry would violate separation of powers, see Scharf, supra, at 282-84; Note, Unsound Method: Judicial Inquiry and Extradition to Northern Ireland, 34 B.C.L.Rev. 591, 638 (1993).
 
 
 29
 In attempting to steer a middle course, the district court ordered an in camera review of the requested documents and gave the U.K. permission to make liberal redactions. The U.K. rejected the court's offer of a protective order and declined to submit the documents to any in camera review.
 
 
 30
 Smyth then filed a motion to dismiss the petition for extradition. He argued that because the government was the moving party and was depriving him of materials necessary to his defense, dismissal was appropriate. The district court found that the U.K. had met its burden in establishing a state secret privilege with respect to the Stalker-Sampson and Stevens Reports. In re Extradition of Smyth, 826 F.Supp. 316, 322 (N.D.Cal.1993). The court further found that the U.K. had not made a sufficient showing that the other documents in question warranted protection under any of the asserted privileges. Id. The court determined that because Smyth had made a "strong showing of necessity for disclosure" of the requested reports, both privileged and non-privileged, and because the U.K. had failed to produce documents for which it could not claim a valid privilege, the former warranted a remedy and the latter, a sanction. Id. at 322-23. Rather than dismissing the petition for extradition, as Smyth had requested, the court granted the following rebuttable presumptions in favor of Smyth:
 
 
 31
 (1) Catholic Irish nationals accused or found guilty of offenses against members of the security forces or prison officials are subjected systematically to retaliatory harm, physical intimidation and death in Northern Ireland.
 
 
 32
 (2) Members of the security forces in Northern Ireland either participate directly or tacitly endorse these actions.
 
 
 33
 Id. at 323.
 
 
 34
 Unrebutted, the presumptions effectively establish that Smyth would suffer retaliatory harm at the hands of security forces in Northern Ireland upon his return. It is significant for purposes of our review, however, that the presumptions do not directly address that prong of Article 3(a) requiring the person sought for extradition to establish that the retaliation or detention would be on account of "race, religion, nationality or political opinions."
 
 
 35
 In a subsequent unpublished order, the district court ruled that the government would be required to rebut the presumptions by a preponderance of the evidence, although the ultimate burden of establishing an Article 3(a) defense by a preponderance of the evidence remained with Smyth.
 
 
 36
 A five-week evidentiary hearing began in September of 1993. The district court treated the presumptions as having shifted the burden of production to the government and required it to proceed first. The government called four officials representing the U.K. government, police, army and prison service to testify as to general U.K. policy and current practices of the security forces and prison forces in Northern Ireland. The witnesses testified that there had been past instances of information leaks and collusion between the Royal Ulster Constabulary, British Army and Prison Service and Loyalist Paramilitaries, but that such problems no longer existed.
 
 
 37
 Smyth called 22 of his own witnesses and introduced dozens of exhibits with which he sought to establish an historical pattern of discrimination against Catholics in Northern Ireland, including a pattern and practice of repeated detentions and questionings of Republican (in particular, IRA) ex-prisoners. The evidence described frequent detentions and questionings that Smyth himself received before his 1977 arrest on the charges that led to the conviction and sentence that is now the subject of these extradition proceedings.
 
 
 38
 Smyth also proffered evidence of the separation of Loyalist and Republican prisoners in the Maze Prison and the cruel treatment afforded those Republicans captured after the 1983 Maze escape. They were returned and required to run a gauntlet of biting dogs to a chant of racial and religious epithets.
 
 
 39
 On cross-examination, several government witnesses refused to answer questions that the district court found relevant. Smyth moved to strike substantial portions of their testimony and requested a directed verdict at the close of the government's case. Again, the district court attempted to steer a middle course: it refused to strike the government witnesses' testimony, but determined to give it less weight than it would otherwise deserve because of Smyth's inability to test the truth of the testimony through cross-examination.
 
 
 40
 Both the government and Smyth introduced statistical reports regarding the pattern of arrests, detentions and treatment of individuals in Northern Ireland. Because both parties produced witnesses to interpret the statistical reports, the court declined to appoint an expert under Federal Rule of Evidence 706(a) to interpret the data. The district court eventually concluded that it was unable to draw any conclusions from either party's proffer of statistical evidence, however. Finding the statistical evidence "flawed by the lack of scientific record-keeping or collection techniques," the court rejected any further consideration of it.
 
 
 41
 The district court made extensive findings of fact regarding the background of political violence in Northern Ireland and the government efforts to combat it, the history of problems with the security forces, the conditions in the Maze Prison, and the background of Smyth, all in an effort to predict what would occur on Smyth's return to Northern Ireland. In its final order, the district court denied the request for certification of extradition on three independent grounds:
 
 
 42
 First, the U.K. did not rebut the presumption that Smyth would face retaliatory punishment and harm upon his return to Northern Ireland. Second, even if the presumption had not been awarded, Smyth established that he would be punished upon return to prison in Northern Ireland. Third, and again without the benefit of the presumption, Smyth established that he would be punished, detained and restricted in his personal liberty upon release into the general population at the conclusion of his prison term in Northern Ireland.
 
 Contentions on Appeal
 
 43
 Perhaps taking their cue from the tone of the district court, the parties on appeal have refrained from extreme positions. Smyth does not challenge the legitimacy of his original conviction and sentence of 20 years. The government does not challenge on constitutional or any other grounds the authority of the district court to examine prison conditions in Northern Ireland under Article 3(a) of the Supplementary Treaty.
 
 
 44
 The government mounts essentially three challenges to the district court's decision. It first argues that the district court misinterpreted the terms of the Supplementary Treaty by inquiring into Smyth's likely post-incarceration treatment by Northern Ireland's security forces. Second, the government challenges the presumptions and evidentiary rulings employed by the district court in reaching its decision. Lastly, it challenges the sufficiency of the evidence to support the district court's findings and conclusions.
 
 Scope of Inquiry Under the Treaty
 
 45
 The court's inquiry into Smyth's likely post-release treatment by the security forces informed two (the first and third) of the court's independent grounds for denying the certification of extradition. The government contends that, in considering evidence concerning potential treatment Smyth might receive at the hands of the government after his release from prison and into the general population in Northern Ireland, the district court erred in its interpretation of the proper scope of inquiry under the treaty. The government points out that the Article 3(a) defense is an exception to the well-established doctrine of noninquiry under which courts traditionally do not concern themselves at all with what would happen to the extraditee upon return to the extraditing nation. See Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir.1983); Restatement Sec. 476(2). The government argues that because the interest of the sending nation ends with the extradition itself, the Article 3(a) exception to noninquiry should be narrowly construed and ought not extend to events that might occur after completion of the formal punishment of the crime for which extradition is sought, i.e., service of the remainder of Smyth's prison term.
 
 
 46
 The district court in this case looked both to Article 3(a)'s legislative history and the language of its second clause, which calls for examination not only of whether the person sought would be prejudiced at his trial (inapplicable to this case), but also of whether he would be "punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions." The district court correctly recognized that the Supplementary Treaty was designed to authorize courts to examine the treatment an extraditee would suffer at the hands of the criminal justice system after extradition. See S.Exec.Rep. No. 17 at 4-5. We agree with the district court insofar as it recognized that it is possible for punishment of one convicted of a crime to extend beyond the jailhouse door. The court below understandably was concerned about evidence that prison guards within Maze Prison had, in the past, provided information to Loyalist forces concerning the time and place of the release of Republican prisoners into the general population so that the former prisoners could be targets of politically motivated violent attacks.
 
 
 47
 We believe that had Smyth demonstrated by a preponderance of the evidence that, after he served the approximately two to five years of his remaining prison time, he likely would be a target of similar conduct by persons within Northern Ireland's justice system, then he would have qualified for the defense to extradition contained in Article 3(a). There was, however, little such evidence. Nearly all of the testimony of harassment of Republican ex-prisoners concerned conduct that occurred in the past. Some of it related to conduct of security forces in the Republic of Ireland rather than in Northern Ireland. There was conflicting evidence as to whether in the future Smyth would be barred from travel outside Northern Ireland after his release.
 
 
 48
 Despite its earlier ruling that it would not conduct a general review of the justice system in Northern Ireland, the district court relied upon more generalized evidence of discriminatory treatment by security forces against Catholics and Irish Nationalists under the Diplock system. That evidence did not necessarily concern persons who had been convicted of crimes. The district court noted that the Article 3(a) inquiry, while unprecedented in extradition law, is analogous to the inquiry undertaken in asylum proceedings where withholding of deportation is requested as a form of relief. See 8 U.S.C. Sec. 1253(h). Looking to 8 C.F.R. Sec. 208.16(b)(2), an immigration regulation implementing the withholding of deportation statute, the district court held that if Smyth could establish past persecution of Catholic Nationalists at the hands of security forces in Northern Ireland during the period preceding the time of the extradition hearing, then existence of such conditions at the time of his release from prison could be presumed. Relying upon 8 C.F.R. Sec. 208.16(b)(3), the district court further held that because Smyth had shown "a pattern and practice" of persecution of Republican sympathizers, such a showing created a presumption that Smyth would be persecuted on religious or political grounds upon his post-imprisonment release into the general population.
 
 
 49
 Here, we conclude the district court erred in at least two respects. In the first place, resort to the withholding of deportation regulation that presumes a present danger of persecution from past experience of persecution cannot validate the district court's presumption of a risk of persecution two to five years in the future. Second, the district court erred in relying extensively upon evidence of the general discriminatory effects of the Diplock system upon Catholics and suspected Republican sympathizers. That evidence does not relate to the treatment Smyth is likely to receive as a consequence of extradition, as required under Article 3(a).
 
 
 50
 Article 3(a) fashioned a compromise between two extreme positions. On the one extreme was the provision of the old treaty that barred any extradition if the underlying crime was a political act, even an act of violent terrorism. At the other extreme was the view espoused by the Reagan administration that the political nature of a crime, and necessarily any punishment or retaliatory treatment that might flow from it, should be irrelevant to the extradition inquiry. The Supplementary Treaty struck a balance between these extremes: it abolished the political act doctrine for some crimes but permitted judicial inquiry into the probable consequences of a given extradition, including imprisonment and other restrictions on liberty that would flow from religious or political discrimination. Article 3(a) thus must be read within both the context of the controversy that gave rise to it and the overall purpose of extradition treaties generally, which is to facilitate criminal prosecution and punishment. See Restatement, vol. 1, pt. IV, ch. 7, subchapter B, ("Extradition"), intro. note, 556-57. "Extradition is the process by which a person charged with or convicted of a crime under the law of one state is arrested in another state and returned for trial or punishment."
 
 
 51
 Considered in this context, the language of Article 3(a) must mean that a federal court in an extradition proceeding may look to the treatment that likely will be accorded the extraditee upon the charge for which extradition is sought. This inquiry need not necessarily be limited to the prosecution and formal term of imprisonment, but Article 3(a) does not permit denial of extradition on the basis of an inquiry into the general political conditions extant in Northern Ireland. The history of the provision shows that it requires an individualized inquiry.
 
 
 52
 Accordingly, in order to defeat extradition on the basis of his prospective treatment at the hands of the justice system extending beyond the duration of his formal imprisonment term, Smyth would have to demonstrate by a preponderance of the evidence that the criminal justice system in Northern Ireland likely would exact additional retribution for his crime beyond the remaining term of imprisonment, and that such additional punishment would be inflicted on account of Smyth's political or religious beliefs, and not on account of his having attempted to murder a prison guard. This is a difficult burden and one which Smyth did not shoulder successfully. The evidence did not establish, independent of the presumptions discussed below, that Smyth would suffer religiously or politically motivated punishment after serving his prison term.
 
 
 53
 The Discovery Presumptions And Evidentiary Rulings
 
 
 54
 The district court imposed rebuttable presumptions of retaliatory harm by security forces in Northern Ireland against Irish Nationals accused or found guilty of crimes against members of security forces or prison officials. The court imposed these presumptions both as a sanction for the U.K.'s refusal to provide requested documents for in camera review and as a remedy for Smyth's inability to obtain evidence relevant to his case. As the court recognized, the rules of evidence and civil procedure that govern federal court proceedings heard under the authority of Article III of the United States Constitution do not apply in extradition hearings that are conducted under the authority of a treaty enacted pursuant to Article II. Cf. Fed.R.Evid. 1101(d)(3). The district court endeavored to use these rules only as a guide. However, the unrebutted presumptions, standing alone, do not suffice to establish the critical elements of the Supplementary Treaty's Article 3(a) defense.
 
 
 55
 Article 3(a) requires that the person sought establish by a "preponderance of the evidence" one of two situations. Under the first clause of the defense, the extraditee may show that the request for extradition has in fact been made with the purpose of trying or punishing him on account of racial, religious or political factors. This is a claim which Smyth cannot and does not make, for he acknowledges he is a fugitive from a valid term of imprisonment, and the purpose of the extradition is to serve his remaining prison term. In the alternative, he must establish that if surrendered, he will be prejudiced at his trial, or "punished, detained or restricted in his personal liberty by reason of his race, religion, nationality, or political opinions." Supplementary Treaty, art. 3(a).
 
 
 56
 The presumptions the district court imposed did not address whether the presumed punishment or restriction on liberty that the security forces would inflict would be on account of Smyth's religion, nationality, or political opinions. Article 3(a), however, clearly contains such a requirement. It does not authorize denial of extradition on account of the punishment, official or unofficial, that will be imposed for the underlying criminal act of attempted murder. It was to avoid such a result that the Supplementary Treaty abrogated the political act doctrine for enumerated crimes and that Article 3(a) was adopted. In concluding that the unrebutted presumptions constituted an independent ground for denying extradition, the district court permitted Smyth to avoid bearing his burden of showing discriminatory motivation and therefore failed to satisfy the requirements of Article 3(a).
 
 
 57
 In addition, the district court required the government to bear the initial burden of going forward as to all aspects of its case. The government thus was required to produce evidence on negatives: that Smyth would not suffer retaliatory treatment after release from prison or, in the alternative, if there were some likely retaliatory treatment, it would not be on account of Smyth's religion or political opinions. The district court ruled that because the presumptions were not successfully rebutted, Smyth qualified for the Article 3(a) defense to extradition. In so doing, the district court improperly shifted the burden of proof from Smyth to the government in contravention of the treaty provision. See Supplementary Treaty, art. 3(a) ("extradition shall not occur if the person sought establishes ... by a preponderance of the evidence....")
 
 
 58
 The district court therefore erred in holding that Smyth satisfied his burden by use of the presumptions. The presumptions could not overcome Smyth's failure to establish that he would likely suffer further punishment on account of his religion, nationality or political views after release into the general population two to five years hence.
 
 Treatment Upon Return to Prison
 
 59
 A final independent basis for the district court's denial of certification of extradition was its finding that Smyth would encounter discriminatory treatment upon his return to prison. This finding was founded upon evidence of conditions in the Maze Prison in the 1970s and 1980s.
 
 
 60
 While the evidence undoubtedly reflected the prospect of harsh treatment if Smyth were returned to the Maze, the critical issue is whether the evidence established that the cruel or retaliatory conditions Smyth faces would be on account of his religion or political opinions rather than, as the government contends, on account of either his crime of attempting to murder a prison guard or his subsequent escape from post-conviction confinement.
 
 
 61
 The district court relied in part upon the fact that Northern Ireland prisons such as the Maze apply stricter security measures to high-risk prisoners, termed "Red Book" prisoners. The court determined that Smyth would be treated as a Red Book prisoner on account of his political opinions. The government correctly points out, however, that Red Book status is accorded to persons who are "flight risks" and that if such status were accorded to Smyth, a former escapee, it would not necessarily relate to his political or religious views.
 
 
 62
 The district court also relied heavily upon the harsh treatment accorded others from the 1983 Maze escape who were returned to the prison. The strongest evidence of post-return, politically motivated mistreatment was evidence that the guards yelled racist and religious epithets while mistreating Smyth's fellow Maze escapees who were returned a decade ago.
 
 
 63
 The evidence of current politically motivated mistreatment, however, was scant. The government offered evidence that Smyth's case was well known in Northern Ireland and that prison officials feared retaliation if they harmed him. In fact, some of Smyth's own witnesses testified that prison conditions at the Maze had greatly improved in the late 1980s. One witness testified as to the conditions in Maze Prison in 1989: "I couldn't believe the transformation from a couple of years previous." ER 1070-71.
 
 
 64
 We conclude that the evidence was insufficient to support a finding that Smyth would face mistreatment in prison on account of his political or religious beliefs. In predicting Smyth's probable treatment in prison, the district court did not distinguish between the relative importance of Smyth's crime and his escape on the one hand, and his political and religious views on the other. The evidence does not support a finding that Smyth would be punished upon his return to prison by reason of his "race, religion, nationality, or political opinions" as required by the Supplementary Treaty. The last ground for the district court's ruling is therefore also infirm.
 
 Conclusion
 
 65
 For the foregoing reasons, the district court's order denying certification of extradition is REVERSED and the matter is
 
 
 66
 REMANDED for ENTRY OF AN ORDER ALLOWING EXTRADITION.
 
 
 
 [1]
 The original bill provided that the political offense determination would be made by the Secretary of State. S. 1639, 97th Cong., 1st Sess., 127 Cong.Rec. 9955-61 (daily ed. Sept. 18, 1981)
 
 
 [2]
 Article 1 provides:
 For the purposes of the Extradition Treaty, none of the following shall be regarded as an offense of a political character:
 (a) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit his case to their competent authorities for decision as to prosecution;
 (b) murder, voluntary manslaughter, and assault causing grievous bodily harm;
 (c) kidnapping, abduction, or serious unlawful detention, including taking a hostage;
 (d) an offense involving the use of a bomb, grenade, rocket, firearm, letter or parcel bomb, or any incendiary device if this use endangers any person; and
 (e) an attempt to commit any of the foregoing offenses or participation as an accomplice of a person who commits or attempts to commit such an offense.
 Supplementary Treaty, art. 1.
 
 
 [3]
 The excerpted colloquy transpired as follows:
 Senator KERRY. Mr. Chairman, as part of that report language I would ask if it is your understanding and intention as principal sponsor of this amendment that an individual, as part of showing that he would, and I quote the language of Article 8 [now Article 3], "if surrendered be prejudiced at his trial or punished, detained, or restricted in his personal liberty by reason of his race, religion, nationality or political opinion," would that individual be able to challenge the fairness of the judicial system to which he would be returned and thereby raise a right of inquiry into the fairness of that system?
 The CHAIRMAN [Senator LUGAR]. Yes.
 Senator KERRY. And that is your intention in this particular amendment as well as in the treaty?
 The CHAIRMAN. That is correct.
 Senator BIDEN. Let me make sure as part of this colloquy that I understand the nature of the rule of inquiry into the justice system in Northern Ireland that we are establishing here.
 My understanding is this: That notwithstanding that probable cause has been established in an American court; notwithstanding that the accused is the person sought; notwithstanding that it is in an extraditable offense under the terms of this treaty we are about to vote on; and notwithstanding that otherwise it is an offense for which extradition would lie; and notwithstanding that it is an offense under this treaty for which the political offense doctrine would not otherwise apply; notwithstanding all of that, the defendant will have an opportunity in Federal court to introduce evidence that he or she would personally, because of their race, religion, nationality or political opinion, not be able to get a fair trial because of the court system or any other aspect of the judicial system in a requesting country, or that the person's extradition has been requested with a view to try or punish them on account of their race, their religion, nationality or political opinion.
 The CHAIRMAN. My answer is yes.
 S.Exec.Rep. No. 17 at 4-5 (emphasis added).
 
 
 [4]
 The Stalker-Sampson Reports documented the investigation of Royal Ulster Constabulary ("RUC") members--the Northern Ireland Police--involved in the 1982 shooting deaths of six people whom the officers suspected of being IRA members. Smyth argued that this set of reports would have revealed the existence of an RUC "shoot to kill" policy regarding suspected Republicans and that the police had committed criminal offenses that perverted the course of justice
 
 
 [5]
 The Kelly Report memorialized an inquiry conducted by Charles Kelly, the Chief Constable in Staffordshire, England, who was appointed in 1988 to consider whether disciplinary charges should be brought against RUC officers identified as having committed murder and other criminal offenses against Catholic Irish nationals suspected of being IRA members
 
 
 [6]
 The Stevens inquiry investigated allegations of collusion between security forces in Northern Ireland and Loyalist paramilitaries. "Loyalists," a subset of the "Unionists"--those people who desire Northern Ireland to remain part of the U.K.--believe that the use of violence is a legitimate means of pursuing that goal